IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JULIE FLOWERS, | ) | CASE NO. 1:16-cv-02593 |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Julie Flowers ("Plaintiff" or "Flowers") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB"). Doc. 1. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

## I. Procedural History

Flowers protectively filed her application for DIB on April 14, 2015.[1] Tr. 17, 92, 196. She alleged a disability onset date of December 23, 2013, (Tr. 17, 196, 224), and alleged disability due to major depression, severe; anxiety disorder; asthma; anemia; and vitamin

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application." http://www.socialsecurity.gov/agency/glossary/ (last visited 9/11/2017).

deficiency (Tr. 78, 89, 111, 121, 248).  After initial denial by the state agency (Tr. 111-119) and denial upon reconsideration (Tr. 121-127), Flowers requested a hearing (Tr. 128-129).  A hearing was held before Administrative Law Judge Joseph Vallowe ("ALJ") on June 13, 2016.  Tr. 35-77.  At the administrative hearing, Flowers was represented by a non-attorney representative.  Tr. 37.

In his June 29, 2016, decision (Tr. 14-34), the ALJ determined that Flowers had not been under a disability within the meaning of the Social Security Act from December 23, 2013, through the date of the decision.  Tr. 17, 28.  Flowers requested review of the ALJ's decision by the Appeals Council (Tr. 13) and submitted new evidence to the Appeals Council through a newly retained attorney (Doc. 12, p. 3; Tr. 332-384, 1332-1531).  On September 12, 2016, the Appeals Council denied Flower's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-8.

## II. Evidence

### A.     Personal, educational, and vocational evidence

Flowers was born in 1971.  Tr. 39, 196.   At the time of the hearing, Flowers was living in a house with her husband, her children and her husband's children.  Tr. 39-40.  The children were ages six, seven, eight, ten and twelve.[2]  Tr. 39-40.  Flowers married her then current husband in August 2015.  Tr. 62.  Her husband is on Social Security disability because of heart issues.  Tr. 40.

Flowers is a high school graduate and she attended college for about a year and a half.  Tr. 42.  Her college studies were focused on human resources.  Tr. 42.  Flowers worked for Progressive from 2001 until 2011 in human resources.  Tr. 45.  In 2007 and 2008, in addition to

---

[2] Her husband's eight-year old daughter stayed with them on the weekends. Tr. 40.

working at Progressive, Flowers tried doing a virtual call center from home. Tr. 47. According to Flowers, she was let go from Progressive because she was on leave for depression after her daughter was born. Tr. 46. After leaving Progressive, Flowers worked at Nestle in human resources. Tr. 43-44, 46. She was there until December 23, 2013, when she went out on disability. Tr. 43. She attempted to return to work in March 2014 but after about three weeks she had major panic and had a horrible meltdown. Tr. 43. Flowers reported receiving disability benefits through Nestle through June 2016. Tr. 1248.

**B.     Medical evidence**[3]

**1.     Treatment records**

On January 14, 2014, Flowers saw Dr. Shila J. Mathew, M.D., a psychiatrist with HealthSpan, with complaints of increased depression and anxiety. Tr. 385-391. Flowers reported that her divorce was finalized in June and she had multiple medical problems, all of which were contributing to her not doing well. Tr. 388. Flowers reported feeling very tired, dizzy, anxious, tense, and depressed and she was having chest pains and her asthma was acting up. Tr. 388. She was on disability from work due to all her problems. Tr. 388. Flowers still loved her ex-husband and he cared for her but he did not want to leave his girlfriend. Tr. 388. She was compliant with her medication but felt that her medication was not working. Tr. 388. Dr. Mathew increased Flowers' Zoloft and indicated that Flowers should continue her counseling. Tr. 388. On mental status examination, Dr. Mathew noted that Flowers was appropriately dressed; her affect was sad; she was tearful and her mood was depressed; she had an appropriate attitude; she was cooperative but anxious; she had panic attacks but no phobias;

---

[3] With the exception of her sentence six remand argument, Flowerss' arguments pertain to the ALJ's assessment of her mental impairment limitations. Doc. 12, p. 5. Accordingly, the treatment record and opinion evidence sections are generally limited to Flower's mental impairments. The evidence that Flowers contends is new and material and warrants a sentence six remand is separately summarized below.

she had no cognitive deficits; her insight and judgment were average; she had poor sleep, low energy, low motivation, and low interest in doing things; and she had no hallucinations. Tr. 389. Dr. Mathew's diagnosis was major depression, recurrent. Tr. 389.

Flowers saw Dr. Mathew again on February 25, 2014. Tr. 391-397. Flowers had been off work from Nestle for several weeks and her anxiety and depression were under control but she reported some anxiety about returning to work. Tr. 394. Flowers was not certain how things would be when she returned to work because she previously had issues with two individuals at work. Tr. 394-395. Flowers reported that she was having problems with her stepmother. Tr. 395. Flowers had to have all her teeth pulled and get dentures, which was making her feel self-conscious. Tr. 395. Flowers was, however, stable and ready to return to work. Tr. 395. Dr. Mathew concluded that Flowers suffered from recurrent depression and indicated that Flowers was going through marital problems. Tr. 395. Dr. Mathew's diagnosis was major depression, recurrent, mild. Tr. 395.

A follow-up visit with Dr. Mathew occurred on March 17, 2014. Tr. 397-403. Flowers' medications included Ambien, Ativan, and Zoloft. Tr. 400. Flowers had returned to work after her last visit with Dr. Mathew. Tr. 400. Flowers reported that things were not going well at work. Tr. 400. She received a poor evaluation at work but Flowers felt that she knew her job well and did a good job. Tr. 400. Flowers felt that people at work were picking on her and she had to constantly defend herself. Tr. 400. Flowers was also feeling stress related to her stepmother. Tr. 401. Flowers felt frustrated and indicated she was unable to talk to anyone without crying. Tr. 401. Dt. Mathew discussed options for dealing with work stress but Flowers did not feel that there was a clear solution. Tr. 401. On mental status examination, Dr. Mathew noted that Flowers was dressed appropriately; she cried during the entire visit; she was

depressed, frustrated and feeling helpless about her situation; low grade anxiety was present; she was not psychotic; she was alert and oriented; her affect was appropriate, she was cooperative; she had no panic attacks; her mood was stable; there was no thought disorder, no phobia, and no cognitive deficits; her insight and judgment were average; and her sleep was good.  Tr. 401.  Dr. Mathew concluded that Flowers suffered from recurrent depression and she was going through multiple stressors in her life, which Flowers was having a difficult time coping with.  Tr. 401.  Dr. Mathew's diagnosis was major depression, recurrent, moderate.  Tr. 401.

Also on March 17, 2014, Flowers saw a licensed social worker for therapy sessions at HealthSpan.[4]  Tr. 403-409.  Flowers saw her therapist again on March 20, 2014.  Tr. 410-415.  Flowers' chief complaints were anxiety, depression and partner relationship problems.  Tr. 413.  Flowers' ex-husband was present with her during her March 20, 2014, therapy session.  Tr. 413.  Flowers' therapist observed that, at first, Flowers seemed fairly relaxed but as the session continued, Flowers became tearful, upset, and was having a hard time letting go of the past.  Tr. 414.  Flowers' ex-husband seemed hesitant to fully commit to Flowers because of their history but it appeared that both Flowers and her ex-husband loved each other and wanted to see change and realized they need to work on it.  Tr. 414.  Flowers was not interested in medication.  Tr. 414.

On March 31, 2014, Flowers saw Dr. Mathew (Tr.  415-421) and she also saw her therapist (Tr. 421-427).  Flowers reported to Dr. Mathew that she had stopped taking her antidepressants because it was giving her diarrhea and she could not tolerate it.  Tr. 419.  Flowers was very anxious, she cried a lot, she was not happy with how things were going in her life, she was frustrated with everything, and she was not able to make a clear decision for herself.  Tr.

---

[4] The licensed social worker's name was Kayla N. Flowers, LISW.  Tr. 403.  To avoid confusion, Kayla N. Flowers, LISW, is referred to herein as therapist.

419. Flowers wanted to move but not with her ex because he was with someone else. Tr. 419. Flowers reported that she interviewed for a higher position at Nestle. Tr. 419. Dr. Mathew's diagnosis was major depression, recurrent, moderate. Tr. 420. Dr. Mathew prescribed medication and advised Flowers to continue with therapy. Tr. 420. Flower's ex attended her therapy session with her. Tr. 425. The therapist noted that Flowers was taking her medication but seemed to be struggling with future decisions and Flowers was not thinking about what she wanted but rather about how her ex fit into her future. Tr. 425. Flowers agreed to see her therapist without her ex at future sessions. Tr. 425.

Flowers continued to see her therapist during 2014. Tr. 427-433, 433-440, 440-445, 445-451, 459-464, 470-475, 480-485. On April 3, 2014, Flowers reported that she had tried going back to work but broke down at lunch when she was talking with a coworker. Tr. 431. Flowers felt that she needed to be done with her ex-husband. Tr. 431. Flowers was going to return to work on April 10, 2014. Tr. 432. On April 9, 2014, Flowers reported that she found a job and place in Florida that were close to her mom. Tr. 437. She was anxious about leaving. Tr. 437. She was not motivated to do things at home and was not doing things or spending time with people or friends. Tr. 437. Flowers' therapist indicated that Flowers did not seem ready to go back to work. Tr. 437. Since Flowers was focused on moving to Florida, her therapist indicated she would need to work through her anxiety in order to be able to proceed with her move. Tr. 437. During a May 12, 2014, session with her therapist, Flowers reported she had interviewed in Florida and quit her job at Nestle because she was planning on moving. Tr. 443. Flowers also reported that she lost her apartment and puppy. Tr. 443. Her son was not doing well in school. Tr. 443. She was very frustrated and was crying daily. Tr. 443. Her mind was racing from one thought to the next and daily chores were difficult. Tr. 443.

On June 24, 2014, Flowers saw clinical nurse specialist Lois L. Nicholson for her depression. Tr. 451-459. Nurse Nicholson's assessment was that Flowers had a history of major depressive disorder and she had tried most antidepressants and mood stabilizers for treatment of her depression. Tr. 455. At that time, Flowers was on Zoloft but it was not helping. Tr. 455. Flowers had previously undergone gastric bypass surgery and higher doses of Zoloft caused her pouch pain. Tr. 455. Nurse Nicholson planned to start Flowers on a new medication – Duloxetin – provided that Flowers could afford it. Tr. 455. Nurse Nicholson also noted that Flowers might consider splitting her antidepressants and taking Lamictal to augment the antidepressant. Tr. 455.

During a July 2014 session with her therapist, Flowers complained of stomach problems associated with starting a new medication and a lack of motivation. Tr. 464. Flowers was upset and frustrated that she was not feeling better. Tr. 462. She wanted to work. Tr. 462. She was attending church more often. Tr. 462. She was having a hard time dealing with her kids. Tr. 462. She was looking forward to getting a puppy and reported that she was planning a trip to King's Island with her mom's family and she was planning some other activities with her kids. Tr. 462. On July 22, 2014, Nurse Nicholson indicated that, in addition to depression, Flowers had insomnia and anxiety. Tr. 468. Nurse Nicholson adjusted Flowers' medication and changed her diagnosis to major depressive disorder, recurrent, severe; anxiety NOS; and insomnia. Tr. 468.

During an August 19, 2014, session with her therapist, Flowers reported that her family recently moved to Brook Park so her children would be attending a new school. Tr. 473. Flowers had moved because of drug issues in the building and because the place was not big enough for her family. Tr. 473. Flowers' ex had moved back in with her. Tr. 473. She was not

crying as much and was sleeping better since being on Klonopin but she was still irritable and anxious.  Tr. 473.  Flowers also saw Nurse Nicholson in August.  Tr. 475-480.

On September 24, 2014, Flowers saw her therapist.  Tr. 480-486.  Flowers reported having problems with her ex and her stepmother.  Tr. 483.  She reported crying all the time and gaining weight.  Tr. 483.  Flowers reported feeling better when she attended church.  Tr. 483. Flowers also saw Nurse Nicholson on September 24, 2014.  Tr. 486-491.  Flowers reported that her mood and anxiety had improved some until she encountered stressful situations with her ex and her stepmother.  Tr. 489.

Flowers saw Nurse Nicholson and her therapist again in November 2014.  Tr. 620-633, 634-636.  Flowers continued to complain of depression and problems with her ex.  Tr. 626, 634. Flowers wanted to switch from Klonopin to Ambien because she felt Ambien worked better for sleep.  Tr. 627.  Nurse Nicholson made adjustments to Flowers' medications.  Tr. 628.  Flowers' therapist noted that Flowers was very emotional and tearful.  Tr. 635.  Flowers reported that she felt that she could not make a good decision.  Tr. 635.

Flowers saw her therapist and Nurse Nicholson on January 13, 2015 for her anxiety and depression.  Tr. 663-671, 672-679.  Flowers relayed that moving was very difficult and she ended up in the hospital for asthma and pneumonia.  Tr. 669, 677.  Flowers' six year old daughter had broken her arm.  Tr. 669, 677.  Her ex-husband had gotten remarried.  Tr. 669, 677. She found out her dad had stage four cancer and could not see him because of his religious beliefs.  Tr. 669, 677.  She was feeling numb. Tr. 669.  She was going to church more regularly and spending time with a friend.  Tr. 669.  She was worried about her children and their behavior getting out of control.  Tr. 669.  Nurse Nicholson continued some medications and made some adjustments as well.  Tr. 679.

Flowers saw Nurse Nicholson on March 18, 2015. Tr. 694-706. Flowers reported increased anxiety. Tr. 700. She was sleeping better with Ambien. Tr. 700. Nurse Nicholson encouraged therapy to help with managing anxiety. Tr. 700. Nurse Nicholson adjusted Flowers' medication by adding Buspirone. Tr. 700, 701. Flowers also saw her therapist on March 18, 2015. Tr. 707-716. Flowers reported feeling very overwhelmed and unable to let things go. Tr. 708. She was crying all the time and was snappy and short tempered. Tr. 708. Flowers had no friends and could not get along with others. Tr. 708. She had started drinking on the weekends without the kids. Tr. 708. She was feeling bad because her boyfriend treated his own daughter different than he treated her daughter and she thought they should be treated equal. Tr. 708. Flowers vented a lot about her stepmother and father. Tr. 708.

Flowers saw Nurse Nicholson on May 5, 2015. Tr. 756-765. Flowers continued to complain of depression, anxiety and insomnia. Tr. 762. Flowers indicated Buspirone was not helping so Nurse Nicholson discontinued it. Tr. 763, 764. Nurse Nicholson started Flowers on a new medication for anxiety – Hydroxyzine – and continued her other medications, which included Trazadone. Tr. 764. On May 11, 2014, Flowers saw a different therapist – Dario Sanchez-Benitez, LISW. Tr. 766-774. Flowers complained of anger, depression, and anxiety. Tr. 772. Flowers was tearful and irritable during her session and discussed familial conflicts. Tr. 772. Flowers agreed to participate in a future family therapy session with Sanchez-Benitez and her children. Tr. 773.

On June 4, 2015, Flowers attended a therapy session with Sanchez-Benitez and her three children. Tr. 1006-1013. Sanchez-Benitez observed the family's interaction and recommended reorganization of family boundaries and assignment of responsibilities. Tr. 1011-1012.

Flowers saw Nurse Nicholson on July 7, 2015, for a follow-up medication appointment. Tr. 997-1005. Flowers relayed problems with her new boyfriend, behavior problems with one of her children, and ongoing issues with her inability to see her father because of his religious beliefs. Tr. 1003. Flowers' anxiety had worsened since having problems with her boyfriend. Tr. 1004. Flowers had only minimal improvement on her medications because of the many problems in her life. Tr. 1004. Nurse Nicholson's diagnoses continued to be major depressive disorder, recurrent, severe; anxiety NOS; and insomnia. Tr. 1004. Nurse Nicholson made some adjustments to Flowers' medications and she recommended follow up in a month and continued counseling. Tr. 1005. On July 13, 2015, Flowers saw her original therapist, with similar complaints. Tr. 989-997. Flowers reported that she was finding strength by putting more into her faith. Tr. 995.

Flowers saw Nurse Nicholson on September 15, 2015. Tr. 945-954. Flowers reported that, notwithstanding recent problems with her boyfriend, they got married in August. Tr. 951. Her new husband was possibly the father to another woman's unborn child. Tr. 951. Flowers was concerned that, if he was the father, she would have to take another child in. Tr. 951.

On October 7, 2015, Flowers saw Sanchez-Benitez for a follow-up therapy appointment. Tr. 931-939. Flowers attended the session with her new husband. Tr. 938. Sanchez-Benitez observed that Flowers was often crying, often fidgeting and she was showing vegetative and cognitive aspects of depression. Tr. 938. She was feeling down, often avoiding eye contact, and she often described family and personal social problems as overwhelming. Tr. 938. Sanchez-Benitez diagnosed major depressive disorder, recurrent, moderate and generalized anxiety disorder. Tr. 938. Sanchez-Benitez recommended that Flowers make a daily effort to get out of

the house after her children were at school and to ignore her prior husband's verbal insults and only communicate with him about the children's activities and visits with him.  Tr. 938.

During a November 12, 2015, session with Sanchez-Benitez that Flowers attended alone, Flowers reported that she was very unhappy in her new marriage.  Tr. 1238-1239.  Flowers indicated that her new husband did nothing around the house to help.  Tr. 1238.  She was very tired most days and her son had been getting poor grades since her divorce from her prior husband.  Tr. 1238.  Flowers' depression was very prominent; she had sleep disturbances, a negative self-image, a sense of hopelessness, worries about the future; and a passive wish to die.  Tr. 1238. Flowers agreed to bring her husband to the next therapy session for a family therapy session.  Tr. 1239.

Flowers returned to see Dr. Mathew on November 19, 2015, for a follow-up medication appointment.  Tr. 1240-1243.  Flowers' chief complaints were depression, anxiety, insomnia, and ongoing issues with her ex-husband.  Tr. 1243.  Flowers was very depressed about her situation. Tr. 1242.  She relayed having one panic attack resulting in emergency room treatment – her medical problems were checked and she was cleared.  Tr. 1242.  Flowers was taking Zoloft and Xanax, both twice a day, with no side effects.  Tr. 1243.  Dr. Mathew noted that Flowers had been "followed by Lois Nicholson before.  I saw this patient several times in the past.  Patient reported that she is on disability and that they need her to have her forms completed by a psychiatrist.  She is not doing a whole lot better than and [sic] I saw her more than a year ago." Tr. 1243.  Flowers denied current suicidal ideation, plan and intent.  Tr. 1241.  Dr. Mathew's assessment was that Flowers had a history of major depressive disorder, she had anxiety, episodic panic attacks, an ongoing problem with insomnia, and multiple personal stressors contributing to her mood.  Tr. 1241.  Dr. Mathew increased Flowers' Zoloft dosage, continued

Flowers on Xanax, and added Ambien for sleep.  Tr. 1241.  Dr. Mathew recommended that Flowers continue with individual and family counseling.  Tr. 1241.

Flowers and her husband met with Sanchez-Benitez on December 1, 2015, for therapy (Tr. 1244-1245) and, on December 7 and December 28, 2015, Flowers met with Sanchez-Benitez, without her husband, for therapy (Tr. 1246-1247, 1248-1249).  Flowers reported major family conflict during the Christmas holiday.  Tr. 1249.  Added to her stress was a letter of denial from Social Security.  Tr. 1249.  Sanchez-Benitez advised Flowers to discuss the social security matter with her attorneys and that she create an emotional space between her husband and herself.  Tr. 1248.  Flowers continued therapy sessions with Sanchez-Benitez in January 2016.  Tr. 1250-1252., 1253-1255.  During a January 18, 2016, session, Sanchez-Benitez observed that Flowers was "profoundly sad, drained, and [in a] tearful mood."  Tr. 1255.  Flowers' diagnosis on January 18, 2016, was major depressive disorder, recurrent, severe without psychotic features and generalized anxiety disorder.  Tr. 1254.

During a March 22, 2016, therapy session with Sanchez-Benitez, Flowers complained of depression, parent-child relationship problems, and partner relationship problems.  Tr. 1256.  Flowers was very tired and agitated.  Tr. 1256.  She was tired of taking care of too many people.  Tr. 1256.  She continued to report being unhappy in her current marriage and feeling unaccepted by members of her husband's family.  Tr. 1256.  Also, Flowers reported that she received another eviction notice.  Tr. 1257.  Flowers' disability payments from her prior job were set to run out in two months.  Tr. 1257.

A few days later, on March 24, 2016, Flowers saw Dr. Mathew for follow up.  Tr. 1258-1259.  Flowers denied side effects from Prozac.  Tr. 1259.  In certain respects her mood was better but she had new issues in her life making her anxious.  Tr. 1259.  She was being evicted

and was not sure where their family of seven was going to move.  Tr. 1259.  Flowers reported that she was unable to sleep without taking Ambien.  Tr. 1259.  Dr. Mathew advised that Ambien was not intended for long-term use and recommended that Flowers try Vistaril and other methods to help her sleep.  Tr. 1259.  Dr. Mathew indicated that Flowers suffered from major depressive disorder and generalized anxiety disorder, had poor coping skills, and saw herself as going through stress all the time.  Tr. 1258.  Dr. Mathew explained that she would be leaving and Flowers would need to make an appointment with a new provider.  Tr. 1258.

### 2. Opinion evidence

#### a. Treating

On January 29, 2016, Shila Mathew, M.D., completed various forms regarding Flowers' mental impairments.  Tr. 1230-1237.  Dr. Mathew rated the severity of Flowers' impairments under Listing 12.04 – Affective Disorders – and Listing 12.06 – Anxiety Disorders.  Tr. 1230-1234.

When completing a form regarding Listing 12.04(A), Dr. Mathew opined that Flowers had disturbance of mood, accompanied by a full or partial depressive syndrome that was evidenced by anhedonia or pervasive loss of interest in almost all activities, appetite disturbance with change in weight, psychomotor agitation or retardation, decreased energy, feelings of guilt or worthlessness, and difficulty concentrating or thinking.  Tr. 1230.  When completing a form regarding Listing 12.06(A), Dr. Mathew opined that anxiety was a predominant disturbance for Flowers as evidenced by generalized persistent anxiety accompanied by motor tension, anatomic hyperactivity (sweating, shortness of breath), and apprehensive expectation.  Tr. 1231.  Also, Dr. Mathew opined that Flowers had a persistent irrational fear of a specific object, activity or situation which resulted in a compelling desire to avoid the dreaded object, activity, or situation

and recurrent and intensive recollections of a traumatic experience, which are a source of marked distress (past growing up experience). Tr. 1231.

Dr. Mathew completed a form rating the severity of Flowers' impairments under Listings 12.04(B) and 12.06(B). Tr. 1232. In that form, Dr. Mathew rated Flowers as having moderate restrictions of activities of daily living; moderate difficulties in maintaining social functioning; moderate deficiencies of concentration, persistence or pace; and four or more repeated episodes of decompensation, each of extended duration. Tr. 1232.

With respect to Listing 12.04(C), Dr. Mathew opined that Flowers had a documented history of a chronic affective disorder of at least two years duration that has caused more than a minimal limitation of ability to perform basic work activities, with symptoms or signs attenuated by medication or psychological support along with repeated episodes of decompensation, each of extended duration; a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in environment would be predicted to cause the individual to decompensate; and current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement. Tr. 1233.

Dr. Mathew also completed a mental RFC assessment, wherein Dr. Mathew rated Flowers' abilities in the areas of understanding and memory; sustained concentration and persistence; social interaction; and adaptation. Tr. 1235-1337. The rating choices were "not significantly limited," "moderately limited," and "markedly limited." Tr. 1235. Dr. Mathew opined that Flowers was not significantly limited in her ability to (1) understand and remember very short and simple instructions; and (2) ask simple questions or request assistance. Tr. 1235, 1237. Dr. Mathew opined that Flowers was moderately limited in her ability to (1) remember

locations and work-like procedures; (2) carry out very short and simple instructions; (3) maintain attention and concentration for extended periods; (4) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (5) make simple work-related decisions; (6) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; (7) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; (8) be aware of normal hazards and take appropriate precautions; and (9) set realistic goals or make plans independently of others. Tr. 1235-1237. Dr. Mathew opined that Flowers was markedly limited in her ability to (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) sustain an ordinary routine without special supervision; (4) work in coordination with or proximity to others without being distracted by them; (5) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (6) interact appropriately with the general public; (7) accept instructions and respond appropriately to criticism from supervisors; (8) respond appropriately to changes in the work setting; and (9) travel in unfamiliar places or use public transportation. Tr. 1235-1237.

### b. Consultative

On July 27, 2015, clinical psychologist Richard N. Davis conducted a consultative examination of Flowers. Tr. 912-918. Flowers relayed that she was always depressed, angry and anxious. Tr. 913. She was receiving mental health treatment at HealthSpan. Tr. 913. Dr. Davis indicated that Flowers cried almost non-stop throughout the examination. Tr. 914, 917.

Flowers reported having trouble getting along with supervisors and fellow workers when employed in the past. Tr. 914. She was last employed at Nestle in December 2013. Tr. 913, 914. Flowers reported that she became severely depressed and had to leave Nestle. Tr. 913.

Flowers reported that everyone in her family wa a Jehovah's Witness and, because she was a non-believer, she was kicked out of the family. Tr. 912, 917. At the time of her examination, Flowers was living with her boyfriend and they were planning on getting married that week. Tr. 913. She had been married in the past but those relationships did not work out. Tr. 913. On a typical day, Flowers reported doing those things that absolutely had to get done while other things, like laundry and dishes, piled up because she was not motivated. Tr. 916. Flowers indicated that her goal was "to get her children 'ready, healthy and happy.'" Tr. 916.

Dr. Davis opined that Flowers had the ability to understand, remember and carry out more than just simple instructions. Tr. 916. With respect to Flower's abilities and limitations in maintaining attention and concentration and maintaining persistence and pace to perform simple tasks and to perform multi-step tasks, Dr. Davis indicated that Flowers had difficulty paying attention and concentrating while in his office because she was crying; Flowers kept telling Dr. Davis that she felt worthless and that no one loved her. Tr. 916. With respect to Flower's abilities and limitations in responding appropriately to supervision and to co-workers in a work setting, Dr. Davis stated that Flowers apparently has problems with supervisors and fellow workers in work settings and she told Dr. Davis that she felt that other people feel threatened by her. Tr. 917. With respect to Flower's abilities and limitations in responding appropriately to work pressures in a work setting, Dr. Davis stated that Flowers apparently was not doing well with the stresses and pressures of her last job, noting that she finally took a leave of absence due to her depression. Tr. 917.

Dr. Davis diagnosed Flowers with major depressive disorder, recurrent, severe. Tr. 917. In his summary, Dr. Davis stated that Flowers "presents as having the ability to think logically and use common sense and judgment but her emotional problems get in the way of being able to make use of those skills." Tr. 918.

### c. Reviewing

On August 26, 2015, state agency reviewing psychologist Todd Finnerty, Psy.D., completed a Psychiatric Review Technique ("PRT") (Tr. 84-85) and mental RFC assessment (Tr. 87-89).

In the PRT, Dr. Finnerty opined that Flowers had mild restrictions in activities of daily living, moderate difficulties in maintain social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no repeated episodes of decompensation, each of extended duration. Tr. 84. Dr. Finnerty noted as explanation for his conclusions that Flowers alleged major depression and anxiety disorder and reported a great deal of difficulty relating satisfactorily to other people and was uncertain as to why people treated her the way that they do. Tr. 84-85.

In the mental RFC assessment, Dr. Finnerty opined that Flowers had no understanding and memory limitations but that she had limitations in the areas of sustained concentration and persistence; social interaction; and adaptation. Tr. 87-89.

With respect to sustained concentration and persistence limitations, Dr. Finnerty opined that Flowers had moderate limitations in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Tr. 88. Dr. Finnerty

further explained this limitation, stating that Flowers could sustain a static set of tasks without fast pace. Tr. 88.

With respect to social interaction limitations, Dr. Finnerty opined that Flowers had moderate limitations in her ability to interact appropriately with the general public; ability to accept instructions and respond appropriately to criticism from supervisors; and ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. Tr. 88. Dr. Finnerty further explained these limitations, stating that Flowers could interact with others superficially. Tr. 88.

With respect to adaptation limitations, Dr. Finnerty opined that Flowers had moderate limitations in her ability to respond appropriately to changes in the work setting. Tr. 89. Dr. Finnerty further explained this limitation, stating that Flowers could adapt to a static setting without frequent changes. Tr. 89.

Upon reconsideration, on December 8, 2015, state agency reviewing psychologist Connie Jenkins, M.D., completed a PRT (Tr. 100-101) and mental RFC assessment (Tr. 103-105). Dr. Jenkins' PRT was the same as Dr. Finnerty's PRT. Tr. 84-85, 100-101. Dr. Jenkins' mental RFC assessment was substantially similar to Dr. Finnerty's mental RFC assessment. Tr. 87-89, 103-105.

In the area of sustained concentration and persistence limitations, in addition to opining that Flowers was moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, Dr. Jenkins also opined that Flowers was moderately limited in her ability to maintain attention and concentration for extended periods of time. Tr. 104. Dr. Jenkins explained these limitations, stating that Flowers could

sustain a static set of tasks without fast pace and that Flowers' affective disorder would be expected to cause distractibility. Tr. 84. In all other respects Dr. Jenkins' mental RFC assessment was the same as Dr. Finnerty's. Tr. 88-89, 104-105.

## C. Hearing testimony

### 1. Plaintiff's testimony

Flowers testified and was represented at the hearing by a non-attorney representative. Tr. 37, 39-70. Flowers discussed stressors in her life that resulted in depression. Tr. 49-50. She indicated that, after she chose to no longer be part of the Jehovah's Witnesses religion, her family rejected her and she was on her own. Tr. 49. She reported that she was married to an alcoholic for eight years, which resulted in depression. Tr. 49. Then, she was married to a man for ten years who cheated, lied, deceived, and manipulated her. Tr. 49. She was diagnosed with post-traumatic stress disorder following the birth of her youngest daughter and ultimately lost her job at Progressive. Tr. 49-50. Her father has stage four cancer but she cannot see him because he is a Jehovah's Witness. Tr. 50. Flowers explained that she remarried again in August 2015 but the marriage was difficult. Tr. 62. She explained that they both had children and trying to blend the two families was very difficult, stating "It's my children against your children scenario." Tr. 62. Flowers stated that she grew up in that type of family environment and she did not want that for her family. Tr. 62.

Flowers was taking Prozac twice a day and Klonopin three times a day for her mental health issues. Tr. 56-57. She indicated that her psychiatrist had discontinued her Ambien so she was unable to sleep. Tr. 57. She was in the process of switching mental health providers and had not been able to speak with a doctor about getting back on Ambien. Tr. 57. When she was on Ambien, Flowers was able to sleep at night. Tr. 58. With respect to medication side-effects,

Flowers reported having diarrhea often because she had bypass surgery and gets a lot of cramping from her medication. Tr. 58.

Flowers reported being hospitalized twice in 2015 for asthma, chest pain, and anxiety. Tr. 59. Each hospitalization in 2015 was overnight for one night. Tr. 59. Since 2013, she also had emergency room visits for asthma and pneumonia. Tr. 59. Flowers was seeing a counselor every week or every two weeks. Tr. 60. She could not say whether the counseling helped, stating "I don't know, I don't know. I don't ever feel better." Tr. 60.

Flowers has lost a lot of friends. Tr. 63. She is not interested in participating in activities – she just wants to stay in the house. Tr. 63. When asked whether she ever attempted suicide, Flowers explained that, in December 2015, at Christmas time, following a fight with her husband she was all alone and had no one to talk to or call and ended up taking seven Ativan and two Ambien "to go to sleep." Tr. 63-64. She was not hospitalized but ended up with a very bad headache. Tr. 64.

Flowers is able to dress and bathe herself but she does not always shower every day. Tr. 65. She is not motivated to do any household chores. Tr. 65. She and her husband have someone cut the lawn for them because they reside on an acre lot. Tr. 65. Flowers goes grocery shopping with her husband and kids but does not go grocery shopping alone. Tr. 66. Flowers attends church but not regularly. Tr. 66. They have a dog. Tr. 66. Flowers puts food out and lets the dog outside but she does not take the dog for walks. Tr. 66-67. Flowers does not have any hobbies. Tr. 67. On a typical day, she gets her kids up and gets their breakfast; she sits down; she might talk to her husband for a couple minutes; and then she ends up falling asleep because she is tired from her depression medication. Tr. 67. Flowers reported having problems

remembering things and needing reminders. Tr. 68-69. She has problems getting along with strangers and thinks it is just better to be alone because then no one has a problem. Tr. 68.

### 2. Vocational expert's testimony

Vocational Expert Thomas Nimberger ("VE") testified at the hearing. Tr. 70-76. The VE described Flowers past work as that of a human resource specialist, a sedentary, skilled position. Tr. 70-71.

For his first hypothetical, the ALJ asked the VE to assume an individual who was the same age and had the same education and work experience as Flowers who could perform work at the light exertional level with additional restrictions of frequent climbing of ramps and stairs; no climbing of ropes, ladders, and scaffolds; frequent balancing, stooping, kneeling, crouching, and crawling; avoidance of concentrated exposure to dust, fumes, and pulmonary irritants; limited to performing simple, routine, and repetitive tasks not at a production-rate pace; superficial interaction with supervisors, coworkers, and the public (meaning no arbitration, mediation, confrontation, negotiation, supervising others, or commercial driving); and limited to tolerating few changes in the routine work setting defined as occasional. Tr. 72. The VE indicated that the described individual would be unable to perform Flowers' past work but there were other jobs in the national economy that the described individual could perform, including (1) packager; (2) mail clerk; and (3) office cleaner. Tr. 72-73. The VE described all three jobs as light, unskilled positions and the VE identified national job incidence data for each of the identified jobs. Tr. 73.

For his second hypothetical, the ALJ asked the VE to assume a sedentary level of exertion along with additional limitations. Tr. 74. In response, the VE identified three unskilled,

sedentary jobs that the described individual could perform and provided national job incidence data for each of the identified jobs.  Tr. 74-75.

For his final hypothetical, the ALJ asked the VE to assume that the individual would be off task 20% of the regular workday exclusive of normal breaks and/or absent more than two days each month including tardy arrivals and early departures.  Tr.  75.  The VE indicated that both restrictions, individually and combined, would preclude all work.  Tr. 75.  In response to follow-up questioning, the VE indicated that an acceptable level of absenteeism for the jobs previously identified would be anything less than two days per month and an acceptable level of off task time would be anywhere from 1-10% off-task.  Tr. 75-76.

**D.     Evidence for which Flowers seeks a sentence six remand[5]**

Flowers contends that certain evidence submitted to the Appeals Council but not the ALJ demonstrates that Flowers' asthma was severe and persistent and satisfies the criteria of listing 3.03B.  Doc. 12, pp. 8-9.  Thus, she contends that a sentence six remand is warranted for consideration of this evidence.  Doc. 12, pp. 18-20.  The evidence Flowers points to includes records from Nurse Practitioner Mindy Schuller, dated January 3, 2012, through March 24, 2016 (Tr. 1345-1415); St. John Medical Center records showing a hospital admission on July 7, 2016, until July 8, 2016, for shortness of breath and asthma exacerbation and chest pain (Tr. 1434, 1484); and a July 18, 2016, record from Flowers' internist Dr. Siscu regarding Flowers' asthma (Tr. 1467).

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial

---

[5] As discussed more fully below, Flowers seeks a sentence six remand for consideration of evidence submitted post-hearing.

gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work. If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The

burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform work available in the national economy. *Id.*

## IV. The ALJ's Decision

In his June 29, 2016, decision, the ALJ made the following findings:[6]

1.      Flowers met the insured status requirements through December 31, 2019. Tr. 19.

2.      Flowers had not engaged in substantial gainful activity since December 23, 2013, the alleged onset date. Tr. 19.

3.      Flowers had the following severe impairments: asthma, iron deficiency anemia, vitamin D and B12 deficiency, S/P gastric bypass, recurrent depressive disorder, generalized anxiety disorder, panic disorder, hypertension, and obesity. Tr. 19-20.

4.      Flowers did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments, including listings 3.03, 12.04, and 12.06. Tr. 20-22.

5.      Flowers had the RFC to perform light work with the following limitations: lifting and/or carrying 20 pounds occasionally, 10 pounds frequently; standing and/or walking 6 hours in an 8 hour work day; sitting about 6 hours in an 8 hour work day; unlimited push and/or pull other than shown, for lift and/or carry; frequently climb ramps and stairs; precluded from climbing ladders, ropes, and scaffolds; frequently balance; frequently stoop; frequently kneel; frequently crouch; and frequently crawl; precluded from concentrated exposure to dust, odors, fumes and pulmonary irritants; limited to the performance of simple, routine and repetitive tasks but not at a production rate pace (e.g., assembly line work); limited to superficial interactions with supervisors, coworkers and the public (no arbitration, mediation, confrontation, negotiation, supervising others, or commercial driving); and limited to dealing with few (occasional) changes in a routine work setting. Tr. 22-27.

6.      Flowers was unable to perform any past relevant work. Tr. 27.

7.      Flowers was born in 1971 and was 42 years old, defined as a younger individual age 18-49, on the alleged disability onset date. Tr. 27.

---

[6] The ALJ's findings are summarized.

8.      Flowers had at least a high school education and was able to communicate in English.  Tr. 27.

9.      Transferability of job skills was not material to the determination of disability.  Tr. 27.

10.     Considering Flowers' age, education, work experience and RFC, there were jobs that exist in significant numbers in the national economy that Flowers could perform, including packager, mail clerk, and office cleaner. Tr.  27-28.

Based on the foregoing, the ALJ determined that Flowers had not been under a disability from December 23, 2013, through the date of the decision.  Tr. 28.

## V. Parties' Arguments

Flowers first argues that the ALJ committed reversible error by not recognizing Dr. Mathew as a treating psychiatrist and assigning only partial weight to Dr. Mathew's January 29, 2016, medical statement.  Doc. 12, pp. 11-15.  Next, Flowers argues that the ALJ erred by assigning great weight to the opinion of consultative examining psychologist Dr. Davis but failing to fully consider and include all limitations identified by Dr. Davis in the RFC.  Doc. 12, pp. 15-18.  Finally, Flowers contends that a sentence six remand is appropriate for consideration of alleged "new" and "material" evidence pertaining to her asthma.  Doc. 12, pp. 18-20.

In response, the Commissioner argues that the ALJ properly considered the medical opinion evidence.  Doc. 14, pp. 15-21.  The Commissioner also argues that Flowers has not demonstrated that a sentence six remand is warranted because the evidence is not "new" or "material" and Flowers has not shown "good cause" for failing to present the evidence prior to the administrative hearing.  Doc. 14, pp. 21-24.

# VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).   The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).

**A.      The Court should reject Flowers' treating physician argument**

Flowers contends that the ALJ committed reversible error by not recognizing Dr. Mathew as a treating psychiatrist and assigning only partial weight to Dr. Mathew's January 29, 2016, medical statement.  Doc. 12, pp. 11-15.

Under the treating physician rule, "[t]reating source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'"  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544.  In deciding the weight to be given, the ALJ must consider factors such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion. *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. § 404.1527(c).

Here, the ALJ acknowledged that Dr. Mathew had treated Flowers on a few occasions (Tr. 26) and considered and assigned weight to Dr. Mathew's opinion (Tr. 21, 25-26).   The ALJ considered Dr. Mathew's opinion at Step Three when assessing whether Flowers had a listing

level mental impairment. Tr. 21. Also, the ALJ explained the reasons for providing only partial weight to Dr. Mathew's opinion. Tr. 25-26. More particularly, after describing in detail the content of Dr. Mathew's January 29, 2016, opinion, the ALJ stated:

> As noted above, the records do not show more than a couple of progress notes by her and the doctor only cites one panic attack and hospitalization. Despite that, Dr. Mathews stated there were 4 or more episodes of decompensation and required highly structured living arrangement. This is not supported in the record, and not even supported by Dr. Mathews' progress notes. I find that the claimant has not met the burden of establishing disability in either physical or mental areas by a preponderance of the evidence. The claimant was seen by this doctor only a few times from 2015 and 2016, and this is an insufficient longitudinal history to support episodes of decompensation. Consequently, I accord only partial weight to this assessment.

Tr. 26.

With respect to Flowers' contention that reversal is required because the ALJ did not specifically refer to Dr. Mathew as a treating source, the undersigned notes that reversal has been deemed warranted where meaningful review could not occur because the ALJ did not make a finding as to whether a doctor was a treating source <u>and</u> did not provide adequate reasons for assigning the doctor's opinion little weight. *See e.g.*, *Montanez v. Comm'r of Soc. Sec.*, 2013 WL 6903764, *1 (N.D. Ohio Dec. 31, 2013). However, the undersigned concludes that Flowers has not shown that the ALJ's failure to specifically refer to Dr. Mathew as her treating psychiatrist amounts to reversible error.

Here, the ALJ acknowledged that Dr. Mathew treated Flowers and assigned weight to Dr. Mathew's opinion. Tr. 21, 25-26. Further, contrary to Flowers' claim that the ALJ failed to address <u>any</u> of the factors contained in 20 C.F.R. § 416.927(c)(2),[7] (Doc. 12, p. 15), the ALJ did consider factors set forth in 20 C.F.R. § 404.1527(c), (Tr. 25-26), and the ALJ was not obligated

---

[7] Flowers cites to the Supplemental Security Income regulation for "Evaluating opinion evidence for claims filed before March 27, 2017." Doc. 12, p. 15. The corresponding DIB regulation is found at 20 C.F.R. § 404.1527(c)(2).

to provide "an exhaustive factor-by-factor analysis" of the factors considered when weighing medical opinions. *See Francis v. Comm'r of Soc. Sec*., 414 Fed. Appx. 802, 804 (6th Cir. 2011).

The ALJ considered the supportability and consistency of Dr. Mathew's opinion with the record as a whole as well as with Dr. Mathew's own treatment notes. Further, the ALJ took into account the length, nature and extent of the treatment relationship. Flowers has not demonstrated that substantial evidence does not support the ALJ's findings that Dr. Mathew's opinions that Flowers had 4 or more episodes of decompensation or that Flowers had a history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement, were not supported by the record or Dr. Mathew's own treatment notes. She does not challenge the ALJ's conclusion that Dr. Mathew's treatment notes only reflect one hospitalization.

Furthermore, both state agency reviewing psychologists concluded that Flowers had no episodes of decompensation, each of an extended duration. Tr. 25, 84, 100. The ALJ considered these opinions and assigned them great weight. Tr. 25.

Additionally, as Flowers' treatment notes reflect, her living arrangement was not highly supportive, yet she was able to continue to care for her family, attended regular therapy sessions (both individual and family), and socialized and married during the alleged period of disability. Tr. 669, 913-915, 1011-1012, 1238.

Also, while Flowers emphasizes that Dr. Mathew was part of the Kaiser/HealthSpan network and she was treated by other medical providers within the Kaiser/HealthSpan network, Flowers does not challenge the ALJ's finding that she had few visits with Dr. Mathew.

The undersigned finds that the ALJ's discussion of Dr. Mathew's opinion and the explanation of the weight assigned to that opinion is sufficiently specific to allow meaningful

review and Flowers has not shown that the ALJ's reasons for providing only partial weight to Dr. Mathew's opinion are not "good reasons" or are not supported by substantial evidence. Accordingly, the undersigned recommends that the Court find no error with respect to the ALJ's consideration of and weight assigned to Dr. Mathew's opinion.

**B.      The Court should reject Flowers' argument that the ALJ erred in his consideration of the consultative examining psychologist's opinion**

Flowers argues that the ALJ erred by assigning great weight to the opinion of consultative examining psychologist Dr. Davis but failing to fully consider and include all limitations identified by Dr. Davis in the RFC.  Doc. 12, pp. 15-18.   There is no dispute that the ALJ considered and weighed Dr. Davis's consultative examining opinion.   The ALJ stated the following with respect to Dr. Davis's opinion:

> Richard Davis, a psychologist, examined the claimant on July 27, 2015 and diagnosed major depressive disorder, recurrent, severe (Exhibit 4F).  The claimant had a boyfriend who did the cooking but that she helped around the place with "other things."  She went to church and alleged that her goal was to get her children ready, healthy and happy.   Thus, despite alleging doing practically nothing, it appears that she was performing activities of daily living centered around her children.  The psychologist stated that the claimant had the ability to understand, remember and carry out more than just simple instructions.  The claimant alleged having had problems with supervisors and fellow workers.  The claimant took a leave of absence from work because of depression and based on this, the psychologist found that the claimant wasn't apparently dealing all that well with the stresses and pressures of her last work setting. She was oriented as to person, place, time and situation.  She presented as someone who was suffering from very severe depression.  Intellectually, she appeared to be capable of functioning within at least the average range when not depressed.  She cried almost nonstop throughout the entire session.  She alleged that she was restricted in her daily activities because she couldn't get motivated to do those things that she should be doing.  She said that she had always been interested in reading and now couldn't concentrate.  She was able to care for her personal needs, and her appearance was satisfactory. She apparently had a great deal of difficulty relating satisfactorily to other people and was uncertain as to why people treated her like they did. She had no difficulty sitting, standing or moving about while examined.  She had no difficulty hearing or speaking.  I give this assessment great weight as it is consistent with the record as a whole.

Tr. 24-25.

Flowers argues that, although great weight was assigned to Dr. Davis's opinion, Dr. Davis's observations that Flowers cried throughout the entire session, had difficulty paying attention and concentration and had a great deal of difficulty relating to others and in handling stress and pressure in work setting were not sufficiently incorporated into the ALJ's RFC assessment.

The ALJ included the following mental limitations in Flowers' RFC assessment:

[L]imited to the performance of simple, routine and repetitive tasks but not at a production rate pace (e.g., assembly line work); limited to superficial interactions with supervisors, coworkers and the public (no arbitration, mediation, confrontation, negotiation, supervising others, or commercial d1iving); and limited to dealing with few (occasional) changes in a routine work setting.

Tr. 22.

The Regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC "based on all of the relevant evidence" of record. 20 C.F.R. §§ 404.1545(a)(3), 404.1546(c). The ALJ, not a physician, is responsible for assessing a claimant's RFC. *See* 20 C.F.R. § 404.1546 (c); *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir.2009). In assessing a claimant's RFC, an ALJ "is not required to recite the medical opinion of a physician verbatim in [her] residual functional capacity finding[ ] [and] an ALJ does not improperly assume the role of a medical expert by assessing the medical and nonmedical evidence before rendering a residual functional capacity finding." *Id.* Thus, contrary to Flowers' suggestion, while the ALJ assigned great weight to Dr. Davis's opinion, the ALJ was not required to incorporate Dr. Davis's opinion wholly into the RFC assessment.

Furthermore, Flowers has not shown that the mental RFC limitations do not adequately account for Dr. Davis's opinion. For example, Dr. Davis opined that Flowers was capable of

understanding, remembering and carrying out more than just simple instructions.  Tr. 916.  The ALJ's RFC limits Flowers to simple and routine tasks.  Tr. 22.  Dr. Davis opined that Flowers had difficulty paying attention and concentration in his office.  Tr. 916.  The ALJ's RFC limits Flowers to repetitive tasks with no production rate pace.  Tr. 22.  Dr. Davis indicated that Flowers apparently has problems with supervisors and fellow workers in work settings.  Tr. 917.  The ALJ's RFC limits Flowers to superficial interactions with supervisors, coworkers and the public.  Tr. 22.  Furthermore, the ALJ's mental RFC limitations are supported by the opinions of the state agency reviewing psychologists, opinions that the ALJ also assigned great to.  Tr. 25, 87-89, 103-105.

For the reasons discussed herein, Flowers has not demonstrated error with respect to the ALJ's consideration of Dr. Davis's opinion or that the ALJ failed to properly account for limitations contained in Dr. Davis's opinion when formulating Flowers' mental RFC.  Accordingly, the undersigned recommends that the Court find no error with respect to the ALJ's consideration of Dr. Davis's opinion.

**C.      The Court should deny Flowers' request for a sentence six remand as unwarranted**

Flowers contends that a sentence six remand is appropriate for consideration of alleged "new" and "material" evidence pertaining to her asthma that was not presented to the ALJ.  Doc. 12, pp. 18-20.

The Sixth Circuit has repeatedly held that where, as here, the Appeals Council denies review and the ALJ's decision becomes the Commissioner's decision, the court's review is limited to the evidence presented to the ALJ.  *See Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001); *Cline v. Commissioner,* 96 F.3d 146,148 (6th Cir. 1996); *Cotton v. Sullivan,* 2 F.3d 692, 696 (6th Cir. 1993); *Casey v. Secretary of Health & Human Servs.,* 987 F.2d 1230, 1233 (6th

Cir. 1993); see also *Osburn v. Apfel,* No. 98-1784, 1999 WL 503528, at *4 (6th Cir. July 9, 1999) ("Since we may only review the evidence that was available to the ALJ to determine whether substantial evidence supported [his] decision, we cannot consider evidence newly submitted on appeal after a hearing before the ALJ.").  The statute permits only two types of remand: a sentence four remand made in connection with a judgment affirming, modifying, or reversing the commissioner's decision; and a sentence six remand where the court makes no substantive ruling as to the correctness of the Commissioner's decision.  *See, e.g., Hollon v. Commissioner*, 447 F.3d 477, 486 (6th Cir. 2006).  The court cannot consider evidence that was not submitted to the ALJ in the sentence four context; it can consider such evidence only in determining whether a sentence six remand is appropriate.  *See Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir. 2007); *Foster*, 279 F.3d at 357.

The plaintiff has the burden under sentence six of 42 U.S.C. §405(g) to demonstrate that the evidence she now presents in support of a remand is "new" and "material," and that there was "good cause" for her failure to present this evidence in the prior proceedings.  *See Hollon*, 447 F.3d at 483; *see also Ferguson v. Commissioner*, 628 F.3d 269, 276 (6th Cir. 2010) (although the material that the claimant sought to introduce was "new," the claimant failed to meet her burden of showing "good cause" for failure to submit materials and that the evidence was "material.").  Evidence is "*new* only if it was not in existence or available to the claimant at the time of the administrative proceeding."  *Ferguson*, 628 F.3d at 276 (internal quotations and citations omitted and emphasis supplied).  "[E]vidence is *material* only if there is a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence."  *Id.*  (internal quotations and citations omitted and emphasis supplied).  "A claimant shows *good cause* by demonstrating a reasonable justification for the failure to acquire

and present the evidence for inclusion in the hearing before the ALJ." *Id.* (internal quotations and citations omitted and emphasis supplied).

Even if Flowers could demonstrate that the evidence is "new" and "material," Flowers has failed to carry her burden of demonstrating "good cause" for her failure to acquire and present the evidence to the ALJ. In an attempt to demonstrate "good cause" for her failure to acquire and present the evidence to the ALJ for his consideration, Flowers asserts that:

> [she] was originally assisted by a non-attorney representative who did not provide any direction or clarity regarding the number of Ms. Flowers' asthma exacerbations . . . [and] [i]t is only when Ms. Flowers' nurse practitioner gathered proof of Ms. Flowers' asthma exacerbations, and her physician submitted additional proof of continuing asthma exacerbations that this issue was adequately addressed. The timing and collection of this evidence was not within Ms. Flowers' control and did not exist in the submitted format at the time of hearing, plus not all events occurred prior to the hearing.[8]

Doc. 12, pp. 19-20.

The fact that Flowers was represented by a non-attorney is an insufficient reason to find good cause to justify Flowers' failure to submit such evidence to the ALJ. *See Lee v. Comm'r of Soc. Sec.*, 529 Fed. Appx. 706, 718 (6th Cir. 2013). As stated in *Lee*,

> Federal law explicitly carves out a place for non-attorney representatives in the disability-determination process, allowing claimants who may not have access to a lawyer a right to "appoint any person who is not an attorney to be your representative in dealings with [the Administration]." 20 C.F.R. § 404.1705(b); *see also* 42 U.S.C. § 406(a). This important right reflects the relatively informal nature of the disability-determination process and allows even claimants with modest resources to be represented in it.

*Id.*

---

[8] Flowers acknowledges that not all events had occurred prior to the hearing. A sentence six remand is not appropriate to consider evidence that a claimant's condition worsened after the administrative hearing. *Walton v. Astrue*, 773 F. Supp. 2d 742, 753 (N.D. Ohio Jan. 18, 2011) (citing *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 685 (6th Cir. 1992)). If Flowers' condition worsened after the administrative hearing, an appropriate remedy would be the initiation of a new claim for benefits as of the date that her condition rose to the level of a disabling impairment. *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 712 (6th Cir. 1988).

Furthermore, Flowers has failed to demonstrate that she herself was blocked from obtaining records from her medical providers that pre-dated the administrative hearing to support her claim that her asthma was a disabling condition.

Considering the foregoing, the undersigned recommends that the Court find that Flowers has failed to demonstrate "good cause" sufficient to support a sentence six remand.

## VII. Recommendation

For the foregoing reasons, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.


September 12, 2017

Kathleen B. Burke
United States Magistrate Judge


## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. Failure to file objections within the specified time may waive the right to appeal the District Court's order. See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).